TARLOW & BERK PC
Barry Tarlow, State Bar No. 36669
Mark O. Heaney, State Bar No. 50724
Attorneys at Law
9119 Sunset Boulevard
Los Angeles, California 90069
Telephone: (310) 278-2111

Attorneys for Defendant
Richard Ayvazyan

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. SA CR11-0180-CJC |
| Plaintiff, | **DEFENSE ANALYSIS OF SENTENCING FACTORS** |
| v. | |
| RICHARD AYVAZYAN, | Hearing Date: July 16, 2012 |
| Defendant. | Time: 10:00 a.m. |
| | Courtroom: Judge Carney |

Richard Ayvazyan, through his counsel of record, respectfully submits this analysis of the 18 U.S.C. § 3553(a) factors for the court's consideration in connection with his sentencing hearing scheduled for July 16, 2012, at 10:00 a.m.

Dated: June 22, 2012

Respectfully submitted,

TARLOW & BERK PC

Barry Tarlow   By Mark Heaney

Mark O. Heaney

Attorneys for Defendant
Richard Ayvazyan

# TABLE OF CONTENTS

I.    STATUS OF THE CASE .......................................... 1

II.   SENTENCING FACTORS ANALYSIS ........................... 1

    A.    Nature and Circumstances of the Offense ...................... 2

    B.    History and Characteristics of Richard Ayvazyan ............... 3

    C.    The Four Purposes of Sentencing ............................ 8

        1.    Retribution ........................................ 9

        2.    General Deterrence ................................. 21

        3.    Specific Deterrence ............................... 22

        4.    Rehabilitation .................................... 24

    D.    The Kinds of Sentences Available .......................... 24

    E.    The Guideline Sentence ................................... 24

    F.    Sentencing Commission Policy Statements ................... 25

    G.    Avoiding Sentencing Disparities ........................... 26

    H.    Restitution ............................................. 27

III.  CONCLUSION ............................................. 27

1

# TABLE OF AUTHORITIES

2

## CASES

3
*Tapia v. United States*, ___ U.S. ___, 131 S. Ct. 2382 (2011) . . . . . . . . . . . . . . . 9

4
*Spears v. United States*, 555 U.S. 261 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

5
*Gall v. United States*, 555 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6
*Kimbrough v. United States*, 522 U.S. 85 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 26

7
*United States v. Henderson*, 649 F. 3d 955 (9th Cir. 2011) . . . . . . . . . . . . . . . . 26

8
*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) . . . . . . . . . . . . . . . . . 22

9
*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 8

10
*United States v. Frias*, 521 F.3d 229 (2nd Cir. 2008) . . . . . . . . . . . . . . . . . . . . . 26

11
*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . 25

12
*United States v. Smith*, 510 F.3d 603 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 26

13
*United States v. Marsh*, 820 F. Supp. 2d 320 (E.D.N.Y. 2011) . . . . . . . . . . . . . . 8

14
*United States v. Cole*, 622 F. Supp. 632 (N.D. Ohio 2008) . . . . . . . . . . . . . . . . . 9

15
*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) . . . . . . . . . . . . . 26

16
*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) . . . . . . . . . . . . . 3

17

## STATUTES

18
18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

19
18 U.S.C. § 3561(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

20
18 U.S.C. § 3663A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

21

## SENTENCING GUIDELINES

22
USSG § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

23
USSG § 5K2.10 (Policy Statement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

24

25

26

27

28

# I
## STATUS OF THE CASE

On January 26, 2012, Richard Ayvazyan pled guilty to conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 371 and 1344. He is scheduled to be sentenced on July 16, 2012, at 10:00 a.m., before United States District Judge Cormac J. Carney. Mr. Ayvazyan's wife and co-defendant, Marietta Ter-Abelian, also pled guilty to this charge and will be sentenced on June 25, 2012.

The presentence investigation report concludes that Mr. Ayvazyan's offense level under the advisory Sentencing Guidelines ("USSG") is 19, and that his Criminal History Category is 1, resulting in a sentencing range of 30-37 months.[1] Finding no basis for a variance outside the Guideline range, the Probation Office recommends that Mr. Ayvazyan be sentenced to a 30 month prison term followed by three years of supervised release, and that he pay restitution to JP Morgan Chase and Bank of America in the amounts of $529,200 and $470,000, respectively.

The defense submits that a 30 month prison term exceeds what is necessary to accomplish the purposes of sentencing set out in18 U.S.C. § 3553(a). As discussed below, an analysis of the statutory sentencing factors in light of the unique circumstances of this case supports a significant downward variance from the advisory Guideline range.

# II
## SENTENCING FACTORS ANALYSIS

18 U.S.C. § 3553(a) identifies seven factors that the court must take into account in arriving at a substantively reasonable sentence. The first factor is "a broad command to consider the nature and circumstances of the offense and the history and characteristics of the defendant." *Gall v. United States*, 555 U.S. 38, 128 S. Ct. 586, 596 n.6 (2007). 18. U.S.C. § 3553(a)(1).

---

[1] The defense disagrees with the report's Guideline calculation and its conclusion that there are no facts in this case which would support a downward departure. *See* Defense Response to Presentence Investigation Report filed under separate cover.

1 | **A.    Nature and Circumstances of the Offense**

2 The facts underlying the bank fraud conspiracy charge are set out in Richard
3 Ayvazyan's plea agreement and need not be repeated here.  However, there are
4 several mitigating circumstances relating to Mr. Ayvazyan's offense which support
5 a downward variance from the Guideline sentencing range.

6 The first factor in mitigation involves the conduct of the "victim" banks in
7 issuing the high-risk loans that give rise to the Guideline loss figure.  As explained
8 in the defense response to the presentence investigation report,[2] the Washington
9 Mutual Option ARM mortgage loan and the Bank of America home equity line of
10 credit, both issued under "stated income" criteria in which the banks informed
11 potential borrowers that no attempt would be made to verify their claimed income,
12 carried a high risk of fraud and potential for default.  The banks were fully aware of
13 this risk, but enthusiastically embraced it in order to make more loans and more
14 profit.

15 With regard to Washington Mutual in particular, the evidence of this cynical
16 approach to mortgage lending is overwhelming, and fully documented in a report by
17 a United States Senate subcommittee.[3]  Given its strikingly poor history of corporate
18 citizenship, it is reasonable to conclude that Bank of America was also a willing
19 participant in these reckless, profit-motivated lending practices.[4]

20 The banks' complicity does not excuse Mr. Ayvazyan's decision to submit
21 false loan applications.  But it does provide a context to his crime which distinguishes
22 it from other bank fraud offenses.  Washington Mutual and Bank of America do not
23 have clean hands here, and for them to play the role of innocent dupes of a crafty

24

25 [2]  The court's attention is respectfully directed to the text at pages 7-15 of that document.

26 [3]  Excerpts from the Senate subcommittee report are included in the Defense
27 Exhibits Re Sentencing filed under separate cover.  The report is discussed at pp. 9-13, *infra*, and at pp. 7-14 of the Defense Response to Presentence Investigation
28 Report.

[4]  See the discussion at pp. 14-21, *infra*.

1  scheme brings to mind a scene from the film "Casablanca." When asked why he is

2  shutting down Rick's Café, Captain Renault states: "I'm shocked, shocked to find

3  that gambling is going on in here!" A waiter then hands Renault his winnings for the

4  evening.

5      This case is also different from a prototypical bank fraud because there is no

6  evidence to suggest that when Mr. Ayvazyan applied for the Washington Mutual and

7  Bank of America loans, he did so with the intent or expectation that the banks would

8  suffer a loss on these transactions. In fact, Mr. Ayvazyan fully intended to meet his

9  financial obligations to the banks, but was prevented from doing so when plummeting

10  real estate values gutted the equity in the Encino Avenue property.

11      In addition, Mr. Ayvazyan's motive for engaging in criminal conduct was not

12  to line his pockets at the banks' expense, but to provide his family and himself with

13  a good home. Employing FBI nomenclature, his crime is one of "fraud for housing,"[5]

14  as opposed to the more blameworthy "fraud for profit."[6]

15  **B.**    **History and Characteristics of Richard Ayvazyan**

16      In *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), the

17  court emphasized the importance of this sentencing factor:

18        "[I]f ever a man is to receive credit for the good he has done, and his

19        immediate misconduct assessed in the context of his overall life hitherto,

20        it should be at the moment of his sentencing, when his very future hangs

21        in the balance. This elementary principle of weighing the good with the

22

23     [5.] Fraud for housing "is typified by a borrower who makes misrepresentations
regarding his income or employment history to qualify for a loan." The "simple

24  motive" underlying this category of mortgage fraud "is to acquire and maintain
ownership of a house under false pretenses." Although the borrower lies on his loan

25  application, his intent is to repay the loan. See, "Types of Mortgage Fraud," Money
Matters 101.com, May 16, 2012, Exh. P, pp. 160-61.

26     [6.] Fraud for profit usually "involves multiple loans and elaborate schemes

27  perpetrated to gain illicit proceeds from property sales." Here the motive is not
simply to acquire a house, but to "revolve equity, falsely inflate the value of the

28  property or issue loans based on fictitious properties." This category of mortgage
fraud, which often involves insiders and other paid participants, is "of most concern
to law enforcement and the mortgage industry." *Id.*

1           bad, which is basic to all the great religions, moral philosophies, and

2           systems of justice, was plainly part of what congress had in mind when

3           it directed courts to consider, as a necessary sentencing factor, 'the

4           history and characteristics of the defendant.'"

5       Richard Ayvazyan will be 34 years old on August 20th. He was born in what

6 was then the Armenian Soviet Socialist Republic, one of 15 republics comprising the

7 former Soviet Union, and lived there until he emigrated to the United States with his

8 mother Zhaneta, younger brother Artur, and other relatives, in June 1989.

9       Mr. Ayvazyan's childhood years in Armenia were far from idyllic. His father,

10 a heavy drinker, meted out almost daily beatings to Richard and his mother and

11 brother "for minor transgressions, or more often, for no reason at all." This pattern

12 of domestic abuse culminated in a harrowing episode in which Richard, only eight

13 years old, had to help his mother escape from his knife-wielding father, who was

14 threatening to kill her. Following this, Richard, Zhaneta and Artur went to live with

15 relatives, and Richard had no further contact with his father who remained in

16 Armenia and died in 2006.

17       From 1989 to 1999, Richard Ayvazyan's life story is a testament to his

18 intelligence, determination, sense of responsibility and capacity for hard work. When

19 he entered fifth grade in September 1989, he spoke only Armenian and had to fathom

20 lessons taught in a completely foreign tongue. He persevered, and by the sixth grade

21 he had become a good student. He continued to do well at Milliken Junior High

22 School in Sherman Oaks and Grant High School in North Hollywood, earning mostly

23 As and Bs in his classes.

24       The family's financial situation was tenuous, and Richard took on a role as

25 breadwinner at a young age. While in junior high, he did odd jobs and earned $30 a

26 week distributing flyers for restaurants. In high school, he worked three days a week

27 cleaning heavy machinery, earning $80 to $100 per day. He did so well at this job

28 that the owner of the business offered to make him a partner. During his high school

1    years, Mr. Ayvazyan also worked as a salesman in the housewares department of a

2    Sears store, as a telemarketer for AT&T, and as a seasonal stocker at Macy's.

3         After graduating from high school in 1997, Mr. Ayvazyan attended Valley

4    College for two years.  He planned to get his AA degree and then transfer to

5    California State University Northridge to pursue a bachelor's degree in advertising.

6    While at Valley College, Mr. Ayvazyan completed a training program and took a

7    position as part-time teller at Wells Fargo Bank.  This later became a full-time job.

8    For two years, he worked at the bank from 9:00 a.m. to 2:00 or 3:00 p.m., attended

9    college classes until 9:00 p.m., and spent weekends working for the equipment

10   cleaning service.

11        Ultimately, this hectic schedule became too much for Mr. Ayvazyan.  Because

12   his mother and brother were not working, and he was the sole source of income for

13   the family, he left Valley College, only six credits short of his AA degree, to work

14   full-time at Wells Fargo.

15        The letters submitted to the court explain how Mr. Ayvazyan assumed the role

16   of "man of the house" at an early age, and describe his maturity and aptitude for hard

17   work. Mr. Ayvazyan's mother states in her letter [Exh. Q]:

18        "I raised my boys without a father figure in their lives; however, Richard

19        was always so mature and responsible that that never became a huge

20        setback in our lives. Richard took on the role of being the 'man of the

21        house' at a very early age, and took full responsibility of his brother and

22        as breadwinner of our household.  It pains me now to think of this

23        because he never had much of a childhood or fun, adventurous teenage

24        life.  However, he never once complained or showed dissatisfaction of

25        his life.  He knew he had to take on these responsibilities because my

26        health was not in order and I was not able to provide as needed for my

27        children."

28        Artur Ayvazyan praises his older brother for acting as a surrogate father

1    [Exh. R], explaining that it was Richard who put him in line when he went through
2    "a lot of bad phases" growing up; who forced him to stay in school when he wanted
3    to drop out; who helped him through substance abuse issues as a teenager; who
4    believed in him and taught him to believe in himself.  Artur concludes:

5         "He is more than a brother to me.  He has been the father figure in my
6         life and my best friend as well.  I don't know how he balanced the strict
7         father characteristics and the understanding, supportive best friend traits
8         at the same time.  However, he did it effortlessly and he has had my
9         respect at all times."

10   Grigor Akopyan, a relative by marriage, states in his letter [Exh. S] that
11   Richard "had to grow up much sooner than his age and has always continued to
12   mesmerize all of us around him with his wisdom and strength."  Mr. Ayvazyan's
13   sister-in-law, Gohar Terabelian, commends him for his maturity, sense of
14   responsibility to family, and strong work ethic [Exh. T].

15   Richard Ayvazyan's concern for others is also evident from the letters
16   submitted on his behalf.  Gohar Terabelian describes how Richard dedicated himself
17   to helping one of her cousins who was going through a time of great stress and
18   depression.  When other family members had given up hope, Richard "remained close
19   to him, giving him strength and support to get through his treatment" [Exh. T].

20   Diana Ashikyan notes that Richard will "go above and beyond to help a person
21   in need and will not expect anything in return" [Exh. U].  His generous spirit is
22   reflected in the assistance he gives to families in Armenia.  Similarly, Zara Ashikyan
23   observes that Richard "appreciates and gives thanks for every positive aspect in his
24   life," and that he "is involved in his community and gives his time and assistance to
25   causes from natural disaster relief to individual ones such as finding a match for a
26   kidney transplant for a young child" [Exh. V].

27   The letters also make clear that Richard Ayvazyan is a loving and devoted
28   husband and father to his three young children, Daniel, age seven; Juliana, age six;

1  and Robert, who will be five in December.  His brother Artur writes [Exh. R] that

2  Richard "takes being a father very seriously, and he is always beside his children at

3  every moment."  Grigor Akopyan [Exh. S] states that Richard believes in "spending

4  quality time with his children, giving them what he never had, a love from a father."

5  He quotes Richard as saying "being a father is a great respect and honor."

6      Gohar Terabelian [Exh. T] explains that Richard is a "hands on" parent who

7  "offers a lot of love and attention to his children."  He helps with their homework,

8  drives them to sports activities and music lessons, and offers them "as much love,

9  attention and knowledge as he possibly can."

10      Zara Ashikyan, a clinical psychologist and long-time friend, offers this

11  assessment of Mr. Ayvazyan's relationship with the children [Exh. V]:

12      "In his personal life Richard has three young children and their love for

13      him is evident and not because of what he buys or gives them but

14      because of his love and care for them.  It is apparent, even to the

15      untrained eye, that he is genuinely interested in developing their minds,

16      emotions, creativity, and most of all their humanity.  He plays and

17      teaches them and in each of his interactions he passes on valuable

18      lessons."

19      Family friend Diana Ashikyan echoes this thought in her letter [Exh. U].

20  Reflecting on Richard Ayvazyan's difficult childhood and his early assumption of the

21  role of man of the family, she writes that his goal in life is being a great father.

22  "Coming from a broken home he has learned just how important a father's role is in

23  a household since he experienced the void of a father in his life."

24      Since 1999, Mr. Ayvazyan has been self-employed in the residential real estate

25  business. However, for the past year he has been precluded from working in this field

26  by conditions of his bond. Accordingly, he assumed the role of stay-at-home parent,

27  devoting himself to caring for the children while Marietta focused on developing her

28  children's salon business. In May of this year, Mr. Ayvazyan returned to the work

1   force, accepting a position as a marketing and sales representative for Adventure
2   Helicopter Tours.

3          Documents produced by the government in discovery reflect that in January
4   1999, when Mr. Ayvazyan was 20 years old, he broke the law. On December 14,
5   1999, he pled nolo contendere to grand theft charges in Los Angeles County Superior
6   Court and was placed on three years probation. Probation was terminated after 16
7   months, following which the court reduced the offense to a misdemeanor, vacated the
8   plea, and dismissed the case. Mr. Ayvazyan has no other criminal record.

9          Richard Ayvazyan has lived a productive life, overcoming significant obstacles
10  to become an exemplary husband, father and friend. He is not perfect. None of us
11  are. But his personal history reflects positive character traits which support a
12  variance from the Guideline sentence in this case. See, e.g., *United States v. Autery*,
13  555 F.3d 864, 874 (9th Cir. 2009).[7]

14  **C.    The Four Purposes of Sentencing**

15         The second statutory factor, 18 U.S.C. § 3553(a)(2), focuses on the general
16  purposes of sentencing and directs the court to consider the need for the sentence
17  imposed: (1) to reflect the seriousness of the offense, promote respect for the law, and
18  provide just punishment for the offense; (2) to afford adequate deterrence to criminal
19  conduct; (3) to protect the public from further crimes of the defendant; and (4) to
20  provide the defendant with needed educational or vocational training, medical care,
21  or other correctional treatment in the most effective manner.

22         As the Supreme Court explained in *Tapia v. United States*, ___ U.S. ___, 131

23

24  [7.] In *Autery*, the Ninth Circuit held that the district court properly considered the defendant's interpersonal stability, motivation and intelligence, the support of his
25  wife and children, the lack of a history of substance abuse, and the absence of sociopathic or criminalistic attitudes as positive factors under § 3553(a)(1). The court
26  concluded that "[e]ach of those attributes, in the reasonable judgment of the court, increased the likelihood that Autery can again become a productive, non-threatening
27  member of free society, thus making more severe punishment less appropriate than if Autery lacked these characteristics." *Id.* at 874. Accord, *United States v. Marsh*,
28  820 F. Supp. 2d 320, 353 (E.D.N.Y. 2011) (citing a defendant's long history of legal employment, strong work ethic and loving family as factors supporting a non-guideline sentence under § 3553(a)).

S. Ct. 2382, 2387 (2011), these four purposes can be summarized as retribution, deterrence, incapacitation and rehabilitation. The "parsimony clause" of § 3553(a) requires the court to "impose a sentence sufficient, but not greater than necessary" to satisfy these purposes.

### 1.   Retribution

In *United States v. Cole*, 622 F. Supp. 2d 632, 637 (N.D. Ohio 2008), the court discussed § 3553(a)(2)'s retribution factor:

> "Retribution involves the calculation of moral culpability, with society gauging the seriousness of the offense and the response that society believes an appropriate response to the offense. In general, retribution imposes punishment to reflect respect for the dignity of the victim. Stated otherwise, society stands with victims and exacts punishment in rough approximation to the detriment caused by the defendant."

The retribution component of § 3553(a)(2) supports a significant variance from the advisory Guidelines sentencing range because the "victims" of Richard Ayvazyan's crime, Washington Mutual Bank, its successor JP Morgan Chase, and Bank of America, have scant dignity worthy of society's respect. Based upon their documented history of illegal conduct, Washington Mutual and JP Morgan Chase more closely resemble  RICO enterprises with banking licenses than ethically responsible, law-abiding lending institutions. For its part, Bank of America has been aptly described as the "poster child for banking industry fraud."[8] The illicit activities of these banks permeate all stages of mortgage lending.

**The Senate Subcommittee Report: Washington Mutual**

After extensive fact gathering and public hearings, the Senate Committee on Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations issued a report in April 2011 titled "Wall Street and the Financial

---

[8.]   "Bank of America: Too Big to Obey the Law," The Economic Populist, September 8, 2011, Exh. W, pp. 180-81.

Crisis: Anatomy of a Financial Collapse." The report explains how profit-driven, high risk mortgage lending contributed to the financial crisis, using as a case study the failure of Washington Mutual Bank. The report concludes that lenders such as Washington Mutual "were not the victims of the financial crisis; the high risk loans they issued were the fuel that ignited the financial crisis." Exh. E, p. 23.

A *New York Times* article quoted the subcommittee's chairman, Senator Carl Levin:

> "Using a toxic mix of high-risk lending, lax controls and compensation policies which rewarded quantity over quality, Washington Mutual flooded the market with shoddy loans that went bad . . . They built a conveyer belt that dumped toxic mortgage assets into the markets like a polluter dumping poison into a river."[9]

The Senate subcommittee found that beginning in 2004, Washington Mutual "embarked upon a lending strategy to pursue higher profits by emphasizing high risk loans," while de-emphasizing conventional fixed rate mortgages. Exh. E, p. 21. From 2004 to 2008, Washington Mutual "churned out a steady stream of high risk, poor quality loans and mortgage backed securities that later defaulted at record rates." *Id.* at 34.

The subcommittee concluded that Washington Mutual "engaged in a host of shoddy lending practices," including: qualifying high risk borrowers for larger loans than they could afford; steering borrowers from conventional mortgages to higher risk loan products; accepting loan applications without verifying the borrower's income; using loans with low, short term 'teaser' rates that could lead to payment shock later when higher interests rates took effect; promoting negatively amortizing loans in which borrowers increased, rather than paid down their debt; and authorizing loans with "multiple layers of risk." *Id.* at 22. The bank compounded these problems by

---

[9]. S. Chan, "Memos Show Risky Lending at WaMu," The *New York Times*, April 12, 2010, Exh. X, pp. 193-94.

1    tolerating the issuance of loans with fraudulent or erroneous borrower information,
2    and designing compensation incentives "that rewarded loan personnel for issuing a
3    large volume of higher risk loans, valuing speed and volume over loan quality." *Id.*
4    at 22, 60.

5         Washington Mutual's senior management was well aware of the problems
6    plaguing the bank's high risk lending strategy, but did nothing to remedy the
7    situation. *Id.* at 22.[10] An internal investigation in 2005 uncovered substantial
8    evidence of false income, employment, credit and appraisal information in mortgage
9    loan applications processed by top producing offices in Downey and Montebello,
10   California. *Id.* at 67-8. Washington Mutual's former Chief Risk Officer testified that
11   these offices were responsible for "eye popping rates of fraud." *Id.* at 69. However,
12   when bank management was presented with the investigation's findings, it not only
13   failed to discipline the responsible parties,[11] it rewarded the head loan officers in
14   Downey and Montebello with trips to Hawaii as members of Washington Mutual's
15   "President's Club." *Id.*

16        Allegations of fraud in the Montebello office surfaced again in 2007,
17   prompting the Office of Thrift Supervision to request another internal investigation.
18   *Id.* at 69-70. In April 2008, Washington Mutual's Audit Department confirmed a
19   62% fraud rate in Montebello loan files, including "falsified income documents,
20   unreasonable income for the stated profession, false residency claims, inflated

21

22   [10.] The subcommittee report points out that "management was provided with
23   compelling evidence of deficient lending practices in internal emails, audit reports
     and reviews." *Id.* at 22. In addition, during the five years prior to Washington
24   Mutual's collapse, the Office of Thrift Supervision identified significant problems
     with the bank's lending and appraisal practices, risk management, and asset quality
25   and requested corrective action. *Id.* at 23. For years, the bank promised to address
     these problems, but never did. *Id.*

26   [11.] Although the fraud rates at the Downey and Montebello offices were 58% and
27   83%, respectively, "[n]o one was fired or disciplined for routinely violating bank
     policy, no anti-fraud program was installed, no notice of the problem was sent to the
28   bank's regulators, and no investors who purchased RMBS (Residential Mortgage
     Backed Securities) containing loans from those two offices were alerted to the fraud
     problem underlying their high delinquency rates." Exh. E, p. 69.

1   appraisal values, failure of the loan to meet bank guidelines, suspect social security

2   numbers, misrepresented assets, and falsified credit information." *Id.* at 70.[12]

3        The Senate subcommittee uncovered evidence demonstrating that the fraud

4   problems in the Downey and Montebello offices were not isolated examples. *Id.* at

5   101-3. Among other things, the report noted that loan personnel in Washington

6   Mutual's Westlake Village office fabricated documents for inclusion in the loan file:

7        "In one egregious example of document 'manufacturing,' a sales

8        associate confessed that if it was too late to call the borrower, the sales

9        associates would take bank statements from other loan files and cut and

10       paste the current borrower's name and address onto the old bank

11       statements. The same sales associate admitted that 'during that crunch

12       time some of the associates would manufacture asset statements from

13       previous loan docs,' because end-of-month loans would often get funded

14       without full documentation.   The pressure to get the necessary

15       documentation was 'tremendous' and they had been told to get the loans

16       funded 'with whatever it took.'" *Id.* at 72.[13]

17       Washington Mutual's decision to emphasize high risk mortgage loans was

18   entirely profit driven. The subcommittee report explains that "[b]ecause higher risk

19   loans required borrowers to pay higher fees and a higher rate of interest, they

20   produced greater initial profits for lenders than lower risk loans." Exh. E, p. 27.

21       Moreover, Washington Mutual had little concern about whether the loans

22

23   [12]    After the 2007 internal report was issued, Washington Mutual resisted
     providing a copy to the Office of Thrift Supervision, claiming that it was protected
24   by attorney-client privilege. The OTS Examiner-in-Chief persisted and after finally
     obtaining the report, concluded that "it was the last straw that ended his confidence
25   that he could rely on Washington Mutual to combat fraudulent practices within its
     own ranks." *Id.* at 71.
26

27   [13]  The report also discusses fraudulent home equity lines of credit originating in
     Washington Mutual's Sunnyvale, California office, and an investigation conducted
28   by Radian Guaranty, Inc., a mortgage insurance firm, which found enough problems
     in the bank's 2006 and 2007 loans to give it an overall rating of "unacceptable." *Id.*
     at 73.

1    would actually be repaid. A section of the subcommittee report headed "Polluting the
2    Financial System" explains that the bank "securitized loans that it had identified as
3    likely to go delinquent, without disclosing its analysis to investors . . . and also
4    securitized loans tainted by fraudulent information, without notifying purchasers of
5    the fraud that was discovered and known to the bank." *Id.* at 81.[14] The subcommittee
6    found that "[o]ne of the root causes of the financial crisis was the ability of lenders
7    like Washington Mutual to securitize billions of dollars in high risk, poor quality
8    loans, sell the resulting securities to investors, and then walk away from the risky
9    loans it created." *Id.* at 93.[15]

10        The subcommittee report was highly critical of Washington Mutual's
11    "destructive compensation policies" in which loan officers were paid primarily on
12    volume rather than on the quality of their loans, and were rewarded for issuing higher
13    risk loans and getting borrowers to pay higher interest rates, even if they qualified for
14    lower rates – practices "that enriched WaMu in the short term, but made defaults
15    more likely down the road." *Id.* at 84. The report noted that these policies "were
16    rooted in the bank culture that put loan sales ahead of loan quality" and that they went
17    right to the top of bank management. *Id.*[16]

18    _____

19    [14]  A Washington Mutual internal report issued in September 2008, which the
     subcommittee characterized as "sobering," revealed that loans identified by its own
20    personnel as containing fraudulent information had been securitized and sold to
     investors. *Id.* at 74. The fraudulent information included misrepresentations about
21    the borrower's income and the appraised value of the property. Exh. E, p. 82.

22    [15]  Documents obtained by the subcommittee revealed that Washington Mutual
     "launched its high risk lending strategy primarily because higher risk loans and
23    mortgage backed securities could be sold for higher prices on Wall Street." Exh. E,
     p. 23. Selling or securitizing the loans had the further advantage of removing them
24    from Washington Mutual's books, thereby helping to insulate the bank from risk. *Id.*

25    [16]  Kerry Killinger, the prime mover behind Washington Mutual's High Risk
     Lending Strategy, was extremely well-compensated, even as the bank began to falter.
26    From 2003 to 2007, Killinger was paid between $11 million and $20 million per year
     in cash, stock and stock options. He was also provided with four retirement plans,
27    a deferred bonus plan, and a separate deferred compensation plan. When he was
     asked to resign in 2008, Killinger received a payout of $25 million. From 2003 to
28    2008, Killinger was paid a total of nearly $100 million in addition to his multi-million
                                                                    (continued...)

On September 25, 2008, Washington Mutual was seized by the Office of Thrift Supervision, put into receivership with the Federal Deposit Insurance Corporation, and sold to JP Morgan Chase. The FBI, SEC and Department of Justice opened criminal investigations into the bank's collapse, but in 2011, the U.S. Attorney's Office in Seattle closed the case without bringing any criminal charges.[17]

**Fraudulent Appraisals: Washington Mutual**

In November 2007, the New York State Attorney General's Office filed a lawsuit charging two firms with engaging in fraudulent business practices by misrepresenting to the public that they were conducting independent appraisals when in fact, they allowed Washington Mutual's loan origination staff to select appraisers who would improperly inflate a property's value to the bank's target loan amount.[18] The Attorney General's Office stated that Washington Mutual "strong-armed [appraisers] into a system designed to rip off homeowners and investors alike."[19]

Washington Mutual's abuse of the appraisal process was not confined to New York. According to a complaint filed by Sacramento appraiser Jennifer Wertz, a Washington Mutual sales manager insisted that she change her description of the local market from "declining" to "stable," and that she produce higher appraisal values for properties she was evaluating. When Wertz refused to comply, she was cut

---

[16.] (...continued)
dollar retirement benefits. *Id.* at 88.

[17.] D. Fitzpatrick and J. Eaglesham, "WaMu Ex-officials Settle FDIC Lawsuit," WSJ.com, December 13, 2011, Exh. Y, p. 198.

[18.] G. Setzer, "NY Attorney General Files Appraiser Fraud Suit Against First American," Mortgage News Daily, November 2, 2007, Exh. Z; Reuters, "NY Court Allows Lawsuit Over Bogus Home Appraisals," Fox Business.com, November 22, 2011, Exh. AA.

[19.] NY Attorney General Sues First American and Its Subsidiary for Conspiring with Washington Mutual to Inflate Real Estate Appraisals," New York State Attorney General's Office, November 1, 2007, Exh. BB, p. 206.

1  off from further work for Washington Mutual.[20]

2  **Securities Fraud: Washington Mutual**

3  In 2008, a securities fraud class action lawsuit was filed on behalf of persons

4  and entities that acquired securities issued by Washington Mutual from October 2005

5  through July 2008.[21]  The 288 page complaint, which includes statements from 89

6  bank employees, demonstrates how Washington Mutual ignored proper risk

7  management, appraisal and underwriting standards in its unrestrained effort to

8  generate a larger volume of mortgage loans.  The New York Times noted that the

9  complaint depicts the bank's mortgage lending operation as "a boiler room where

10  volume was paramount and questionable loans were pushed through because they

11  were more profitable to the company."[22]

12  In July 2011, Washington Mutual agreed to pay $105 million to settle this case.

13  Goldman Sachs and other underwriters contributed an additional $102.5 million.  Of

14  course, this was done without any admission of wrongdoing by the defendants.

15  **Failure to Comply with the Federal Mortgage Relief Program: Bank of America**

16  In March 2010, a federal class action lawsuit was filed against Bank of

17  America accusing it of intentionally withholding government funds intended to save

18  homeowners from foreclosure under the Home Assistance Modification Program.[23]

19

20  [20.] S. Gandel, "WaMu Accused of Appraisal Fraud," CNN Money.com, January 17, 2008, Exh. CC.

21
22  [21.] *In Re Washington Mutual, Inc. Securities Litigation*, No. 2-08-MD-1919-MJP, Lead Case No. C08-387-MJP (W.D. Wa.).

23  [22.] G. Morgenson, "Was There a Loan It Didn't Like?," The New York Times.com, November 1, 2008, Exh. DD, p. 213. Keysha Cooper, a senior mortgage underwriter
24  at Washington Mutual, and one of the 89 employees quoted in the securities fraud complaint, told the Times: "At WaMu it wasn't about the quality of the loans; it was
25  about the numbers.  They didn't care if we were giving loans to people that didn't qualify.  Instead, it was how many loans did you guys close and fund?"  Ms. Cooper
26  provided examples of how she was pressured by bank management to approve loans she had identified as clearly fraudulent, and placed on probation for refusing to do so.
27  *Id.*

28  [23.] Reuters, "Bank of America sued for Not Modifying Mortgage," March 23, 2010,
(continued...)

1   According to the complaint, Bank of America "had an incentive not to modify loans
2   because doing so might cause it to repurchase more loans, collect lower servicing
3   fees, or assess lower default charges because fewer payments would be deemed late."
4   Accordingly, the bank "serially strung out, delayed and otherwise hindered the
5   modification process," leaving thousands of borrowers "often worse off than they
6   were before they sought a modification."[24]

7   **FDIC Suit: Washington Mutual**

8       In March 2011, the Federal Deposit Insurance Corporation filed a complaint
9   in United States District Court in Seattle charging former officers of Washington
10  Mutual with gross negligence, breach of fiduciary duty and fraudulent conveyance.
11  *Federal Deposit Insurance Corp. v. Killinger, et al.*, No. 2:11-CV-00459- MJP.[25]

12      According to the FDIC complaint, Washington Mutual "recklessly made
13  billions of dollars in risky single family residential loans . . . knowing that the real
14  estate market was in a bubble that could not support such a risky strategy over the
15  long term," all the while ignoring repeated warnings from its risk managers. Exh. I,
16  p. 115-16. The problem was exacerbated because the bank focused its aggressive
17  lending in California and Florida, "where housing prices had escalated most rapidly
18  and were most at risk for significant decline." *Id.*, p. 118.

19      This "relentless push for growth," carried out under Washington Mutual's
20  advertising slogan, "The Power of Yes," promised that few borrowers would be
21  turned down. *Id.*, p. 116. Steven Knobel, founder of an appraisal firm that did
22  business with Washington Mutual until 2007, summed it up this way: "If you were
23  alive, they would give you a loan. Actually, I think if you were dead, they would still

24

25

26  [23.] (...continued)
    Exh. EE.

27  [24.] *Id.*

28  [25.] Excerpts from this complaint are included in the Defense Exhibits Re
    Sentencing, Exh. I.

1   give you a loan."[26]

2       The FDIC suit ended with a whimper in December 2011, when three

3   Washington Mutual executives agreed to settle the case for less than ten percent of

4   the $900 million sought in the complaint. A Wall Street Journal article reporting on

5   the settlement stated:

6          "The deal would mark the latest setback for the government in a high-

7          profile, financial-crisis-related case. The lion's share of the payout,

8          which is expected to total less than $75 million, would come from

9          insurers and the bank's estate – not from the pockets of the former

10         executives."[27]

11   **Illegal Mortgage Servicing Practices:  Bank of America**

12       When Bank of America acquired Countrywide Financial Corp. in July 2008,

13   it agreed, in a multi-state settlement, that Countrywide had engaged in widespread

14   consumer fraud in the origination, marketing and servicing of mortgage loans, and

15   consented to major changes in its loan servicing practices.

16       In August 2011, the Nevada Attorney General's office filed the third in a series

17   of lawsuits accusing the bank of routinely violating the terms of the settlement

18   agreement.[28] The complaint alleges that beginning in 2009, Bank of America violated

19   the Nevada Deceptive Trade Practice Act "by engaging in a pattern and practice of

20   misrepresentations in their loan modification program," including: (1) falsely

21   promising consumers that their trial modifications would be made permanent if they

22   made three required payments; (2) falsely assuring borrowers that their homes would

23   not be foreclosed while their loan modification requests were pending; (3)

24   misrepresenting modification eligibility criteria; (4) falsely notifying borrowers or

25

26   [26]  "Washington Mutual Settlement Lets Former Executives Pay $64 Million of $900 Million Suit," Huffington Post, December 13, 2011, Exh. FF, p. 220.

27   [27]  "WaMu Ex-officials Settle FDIC Lawsuit," Exh. Y, p. 196.

28   [28]  *State of Nevada v. Bank of America Corp.*, No. 3:11-CV-135-RCJ (D. Nev.), Exh. GG.

1  credit agencies that borrowers were in default on their mortgages; (5) falsely
2  representing in recorded documents that the bank had authority to foreclose on
3  borrowers' homes as servicer for the trusts that held the mortgages; and (6) providing
4  borrowers with false and misleading explanations for why their mortgage
5  modifications were denied. Exh. GG, pp. 224-25.

6  **Securities Fraud: JP Morgan Chase and Bank of America**

7  In September 2011, the Federal Housing Finance Agency filed lawsuits in
8  federal and state courts in New York and Connecticut accusing JP Morgan Chase,
9  Bank of America, and other lenders of misrepresenting the risks involved in $200
10 billion in mortgage securities backed by stated income and other risky loans sold to
11 Fannie Mae and Freddie Mac. A Los Angeles Times article noted that "[t]he lawsuits
12 illustrate how federal authorities, largely stymied in attempts to mount criminal
13 prosecutions related to the mortgage crisis, are targeting Wall Street in civil
14 lawsuits."[29] Both banks had come under SEC scrutiny on prior occasions.[30]

15 **Securities Fraud:  JP Morgan Chase**

16 In June 2011, JP Morgan Chase paid $153 million to settle charges that it
17 misled investors in a complex mortgage securities transaction involving a $1.1 billion
18 investment vehicle called Squared CDO that the bank set up in 2007.  The SEC's
19 Director of Enforcement stated that the bank failed to inform investors that a

---

[29] E. Reckard, "Federal Housing Finance Agency Sues 17 Banks over Mortgage Bonds," Los Angeles Times, September 2, 2011, Exh. HH, p. 228. A Wall Street Journal article about the FHFA lawsuits states that "[t]here has been widespread discontent among some taxpayers that banks and other financial institutions haven't been sufficiently reprimanded for their roles in the housing and mortgage crisis that has led to millions of Americans ending up in foreclosure, as well as a myriad of other financial and economic problems." N. Timiraos, R. Sidel and R. Simon, "U.S. Sues Big Banks Over Home Mortgages," WSJ.com, September 3, 2011, Exh. II, p. 233.

[30] The New York Times analyzed SEC documents showing 51 repeat violations for intentional or negligent fraud from 1996 to 2010 by 13 firms. Bank of America tied for the lead with six repeat violations. J.P. Morgan Chase had four repeat violations. "Wall Street's Repeat Violations, Despite Repeated Promises," New York Times, November 2011, Exh. JJ. It would seem that the banks view SEC settlements simply as a cost of doing business.

---

prominent hedge fund that had heavily influenced the CDO asset portfolio selection would profit from the failure of those assets.  The SEC alleged that Chase launched a "frantic global sales effort" in March and April 2007, as the housing market appeared to be collapsing.  Ten months later, the securities had lost most of their value.[31]

**Fraudulent Use of Mortgage Data Base: JP Morgan Chase and Bank of America**

In February 2012, the Attorney General of New York filed a lawsuit against J.P. Morgan Chase, Bank of America, and Wells Fargo accusing them of fraudulently using the Mortgage Electronic Registration Systems in order "to evade county recording fees, avoid the need to publicly record mortgage transfers, and facilitate the rapid sale and securitization of mortgages en masse."[32]  On March 14, 2012, the three lenders agreed to pay more than $30 million to settle this case.[33]

**Improper Foreclosure Practices:  JP Morgan Chase and Bank of America**

Recently, JP Morgan Chase, Bank of America and three other major banking firms agreed to pay $25 billion to extricate themselves from an eighteen month investigation by the Justice Department and 49 state attorneys general focusing on improper foreclosure paperwork and mortgage servicing.[34]  Court documents revealed that "the allegations of wrongdoing by the banks went beyond the practice of so-called robo-signing" and covered "a pattern of unfair and deceptive practices in servicing mortgages, including failing to apply mortgage payments correctly,

---

[31]  D. Rushe, "JP Morgan Pays SEC $153M to Settle Charges Over Mortgage Securities," The Guardian, June 21, 2011, Exh. KK.

[32]  Reuters, "New York Sues Banks, Alleges Electronic Mortgage Fraud," February 3, 2012, Exh. LL.

[33]  "Banks Used Flawed Data in Pursuing Foreclosures," National Law Journal, March 19, 2012, Exh. MM.

[34]  J. Puzzanghera and E. Reckard, "Deeply Underwater Homeowners to Get Most Aid from Foreclosure Deal," Los Angeles Times, March 12, 2012, Exh. NN, p. 248.

1   charging excessive fees and lying to borrowers."[35]

2        A *Los Angeles Times* article explains that Bank of America's conduct was

3   particularly egregious:

4        "State and federal officials also demanded that Bank of America be part

5        of the settlement because its handling of troubled borrowers was the

6        most flawed among the major banks. Officials said that BofA - serviced

7        loans generated an outsized share of complaints about lost paperwork,

8        unresponsiveness to homeowners and such tactics as telling borrowers

9        they were good candidates for loan modifications while pressing at the

10       same time for foreclosures."[36]

11       Commentators have been sharply critical of this settlement, characterizing it

12  as a "get-out-of-jail-cheap card,"[37] and an example "of how sad our enforcement of

13  the law has been up to now, and how hard it will be to enforce it in the future if this

14  is the best we can do in the face of manifestly illegal behavior."[38]

15

16  [35.] *Id.*, p. 249. In 2010, J.P. Morgan Chase, Bank of America, and other major
    mortgage lenders came under scrutiny for using "robo signers" to create mortgage
17  transactions and to process thousands of foreclosures a month without ever reviewing
    the borrowers' paperwork. As reported in the October 3, 2011 issue of Time,
18  documents revealed that "many of the individuals who signed off on the mortgage
    bonds never worked at the banks and were often approving dozens of deals and
19  thousands of loans for numerous banks at the same time." "Outside Job - Lawsuits
    Show Mortgage Deals Had Robo-Signers," Time, October 3, 2011, Exh. OO.

20
    [36.] "Deeply Underwater Homeowners," *supra*, Exh. NN, p. 250.
21
    [37.] H. Meyerson, "Deal Breaker," Los Angeles Times, November 21, 2011, Exh. PP.
22  Meyerson, editor of American Prospect and op-ed columnist for the Washington Post,
    complained that in return for the payment, "the states would agree not to pursue
23  claims against the banks for whatever fraud and abuse they may have committed in
    originating dubious mortgages . . . [and] would also let the banks escape liability for
24  misrepresenting those mortgages to the investors on whom they unloaded them."

25  [38.] M. Hiltzik, "Mortgage Settlement is Great - for Politicians and Banks," Los
    Angeles Times, February 11, 2012, Exh. QQ, p. 258. Hiltzik noted that the lesson
26  from the settlement is: "Break the law and the full weight of the state and federal
    government will come down on your head to make you agree not to break the law in
27  the future." *Id.* Hiltzik also disclosed that federal regulators will be assisting the
    banks in meeting their $25 billion settlement obligation by remitting or waiving
28  hundreds of millions of dollars in otherwise applicable penalties. M. Hiltzik,
    (continued...)

1    Richard Ayvazyan committed a crime by lying in mortgage loan applications,
2    and must face the consequences of his actions.  But Mr. Ayvazyan, and others like
3    him, are the "low hanging fruit" of the mortgage fraud crisis, facing the wrath of the
4    Justice Department while the banks and other major players escape prosecution for
5    a litany of illegal activities.  As one financial fraud expert put it:  "The failure to
6    prosecute any of the major accounting control frauds that made and sold tens of
7    thousands of fraudulent liar's loans is a national scandal."[39]

8    **2.    General Deterrence**

9    18 U.S.C. § 3553(a)(2)(B) requires the court to consider the need for the
10   sentence imposed "to afford adequate deterrence to criminal conduct."  The weight
11   to be accorded general deterrence is a matter for the court's informed discretion.[40]  It
12   should be noted, however, that the Ninth Circuit has held that a term of imprisonment
13   is not always necessary to afford adequate deterrence in white collar criminal cases.
14   *See, e.g., United States v. Edwards,* 595 F.3d 1004, 1016-17 (9th Cir. 2010), *reh. en.*
15   *banc den.,* 622 F.3d 1215 (9th Cir. 2010); *United States v. Autery,* 555 F.3d 864, 876

---

[38.]  (...continued)
"Lowering Our Expectations for Foreclosure Settlement," Los Angeles Times, March 7, 2012, Exh. RR, pp. 262-63.

[39.]    W. Black, "An open letter to California Attorney General Harris," New Economic Perspectives, October 7, 2011, Exh. SS, p. 271. Mr. Black is an Associate Professor of Law and Economics at the University of Missouri, Kansas City School of Law. He was Executive Director of the Institute for Fraud Prevention from 2005-2007. Prior to that, he served as Litigation Director of the Federal Home Loan Bank Board, Deputy Director of the Federal Savings and Loan Insurance Corporation, Senior Vice-President and General Counsel of the Federal Home Loan Bank Board of San Francisco, Senior Deputy Chief Counsel of the Office of Thrift Supervision, and Deputy Director of the National Commission on Financial Institution Reform, Recovery and Enforcement.

[40.]  In *United States v. Cole,* 622 F. Supp. 2d 632, 638-39 (N.D. Ohio 2008), the court concluded that the general deterrence sentencing factor raises theoretical and practical issues. As to the former, the question may be asked: Is it ethical to subject a defendant to a longer period of incarceration than retribution requires in order to "send a message" to other potential offenders? *Id.* at 638. From a practical standpoint, the efficacy of incarceration as a deterrent to crime is open to question since there are over 2.25 million people in jail in this country, the highest incarceration rate in the world, at a monthly cost of $2,100 per inmate. *Id.* at 639-40.

1    (9th Cir. 2009).

2         In weighing general deterrence, it is also important to note that Congress,

3    through enactment of the Dodd-Frank Wall Street Reform and Consumer Protection

4    Act,[41] has taken steps to prohibit the lax lending practices that set the stage for

5    Richard Ayvazyan's criminal conduct.[42] Among other things, Dodd-Frank prohibits

6    low-documentation loans in which lenders confirm the borrower's employment but

7    not his income or assets;[43] requires lenders to make a reasonable, good-faith

8    determination that the borrower has the ability to repay a residential mortgage loan;[44]

9    and imposes new requirements on mortgages that allow consumers to defer payment

10   of principal or interest.[45]

11        **3.    Specific Deterrence**

12        In fashioning an appropriate sentence, the court is also required to consider the

13   question of specific deterrence. That is, the need for the sentence imposed "to protect

14   the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).

15        The Ninth Circuit has recognized that this goal can be achieved through a

16   probationary sentence with strict conditions. *United States v. Autery, supra,* 555 F.3d

17   at 876. That is the case even where the defendant has a prior conviction for a similar

18

19

20   [41.] Pub. L. No. 111-203, 124 Stat. 1376 (2010).

21   [42.] V. DiLorenzo, "Mortgage Underwriting After Dodd-Frank: New Standards and
22   Unfinished Business," NYSBA N.Y. Real Property Law Journal, v. 39, no. 2 (2011),
     Exh. TT. The Act covers federal and state chartered banks and mortgage companies
23   and applies to purchase money mortgages, refinancings and home equity loans.

     [43.] *Id.*, p. 274.
24

25   [44.] *Id.* In making this determination, the creditor must consider, among other
     factors, the borrower's current and future income, employment, and financial
26   resources other than equity in the home that secures the loan, and must also verify the
     income and assets it relies upon to determine repayment ability.

27   [45.] The most risky underwriting practices with respect to such loans are avoided
     because, in order to satisfy the "ability to repay" standard, the creditor cannot rely on
28   the low initial interest rate or on any payment option other than a fully amortizing
     payment schedule. *Id.*, p. 275.

offense. *United States v. Edwards*, *supra*, 595 F.3d at 1017.[46]

In this context, it is significant that the prosecution of this case has already taken a heavy toll on Richard Ayvazyan. Mr. Ayvazyan's sister-in-law, Gohar Terabelian [Exh. T], has noticed a significant change in his attitude and demeanor:

> "He has always been so strong, mentally and spiritually, knowing exactly what needs to be done and does it, he doesn't lose hope and is always so positive. He's been confident, ambitious, and strives to do so much; however he's been depressed lately and has lost a lot of his focus. I have never seen him this way before. I know this situation with the law has been bothering him a lot. He thinks about it too much and he worries a lot about his mother, wife and kids. He is so embarrassed by it that he doesn't even go out as much. They have been completely out of the social scene, and have been missing many of the family gatherings because he is so ashamed which is so unlike him. Everyone has always respected him so much, and still do. He made a mistake, and he's paying for it greatly by fighting his own emotions and worrying so much."

Artur Ayvazyan observes that this case has affected Richard tremendously, and that he is depressed and uncertain about his future [Exh. R]. His mother describes him as "depressed, stressed and overwhelmingly humiliated" [Exh. Q]. Father Myron Aznikian, an Armenian orthodox priest, has discussed the case with Mr. Ayvazyan and describes him as "greatly ashamed of his disgrace." Father Aznikian is "helping him heal with these feelings of shame and embarrassment" [Exh. UU].

---

[46.] Edwards pled guilty to bankruptcy fraud and making false statements to a bank, in violation of 18 U.S.C. §§ 152 and 1014. He had a prior state court felony conviction for theft based on misrepresentations made to Arizona banks. Although the advisory Guidelines sentencing range was 27-33 months, the district court granted a downward variance based on its analysis of the § 3553(a) factors, sentencing Edwards to five years probation with seven months of house arrest, together with a fine and restitution. The Ninth Circuit affirmed the sentence, rejecting the government's contention that it was substantively unreasonable.

1    Finally, Mr. Ayvazyan's close, loving relationships with his wife and children

2    support the conclusion that he is unlikely to commit crimes in the future. See, *United*

3    *States v. Marsh*, 820 F. Supp. 2d 320 (E.D.N.Y. 2011).[47]

4    **4.    Rehabilitation**

5    18 U.S.C. § 3553(a)(2)(D) requires the court to consider the need for the

6    sentence imposed "to provide the defendant with needed educational or vocational

7    training, medical care, or other correctional treatment in the most effective manner."

8    However, 18 U.S.C. § 3582(a) provides that the court must conduct its evaluation of

9    the § 3553(a) factors "recognizing that imprisonment is not an appropriate means of

10   promoting correction and rehabilitation." *Tapia v. United States*, *supra*, 131 S. Ct.

11   2382 (holding that the Sentencing Reform Act precludes federal courts from imposing

12   or increasing a prison term in order to promote the defendant's rehabilitation).

13   **D.    The Kinds of Sentences Available**

14   18 U.S.C. § 3553(a)(3) directs the court to consider "the kinds of sentences

15   available." In this case, the five year maximum term for conspiracy offenses provided

16   for in 18 U.S.C. § 371 is the only statutory restriction on the court's sentencing

17   options. Conspiracy under 18 U.S.C. § 371 is a Class D felony, and the conspiracy

18   statute does not preclude a probationary sentence. Accordingly, under 18 U.S.C.

19   § 3561(a), the court may impose a term of probation in lieu of incarceration. As

20   stated in the presentence investigation report, the court can include, as part of a

21   sentence of probation, a condition requiring confinement at a community corrections

22   center, participation in a program of home confinement, or both [¶ 88].

23   **E.    The Guideline Sentence**

24   The correctly calculated Guideline range is a factor to be considered under §

25

26   ---
     [47.]  In *Marsh*, United States District Judge Jack B. Weinstein sentenced a group of
27   18 defendants for "participating in a criminal scheme to defraud thousands of
     investors in publicly traded securities of millions of dollars in fees for investment
28   advice."  820 F. Supp. 2d at 329.  In sentencing various defendants to below
     Guidelines sentences ranging from three to 24 months, Judge Weinstein repeatedly
     noted that the defendants' close family ties made it unlikely they would re-offend in
     the future. *Id.* at 353, 358, 363, 368, 381-82.

1   3553(a)(4), but is not to be weighted more heavily than the other factors. *United*
2   *States v. Carty*, 520 F.3d 984, 994 (9th Cir. 2008).

3       Applying USSG § 2B1.1, the presentence investigation report's advisory
4   Guideline calculation starts with a base offense level 6 and adds 16 additional levels
5   based on a loss figure of $1,029,000. As discussed in its response to the report, the
6   defense objects to this loss calculation, and submits that the total loss for Guideline
7   purposes does not exceed $834,092.74, which corresponds to a 14 level increase
8   pursuant to the loss table in USSG § 2B1.1(b)(1). The facts of this case also support
9   a downward departure pursuant to USSG § 2B1.1, Application Note 19(C).[48]

10  **F.    Sentencing Commission Policy Statements**

11      Pursuant to 18 U.S.C. § 3553(a)(5), the court must consider pertinent policy
12  statements issued by the Sentencing Commission. The victim's conduct policy
13  statement, USSG § 5K2.10, provides that "[i]f the victim's wrongful conduct
14  contributed significantly to provoking the offense behavior, the court may reduce the
15  guideline range to reflect the nature and circumstances of the offense." It further
16  states that this provision "usually would not be relevant in the context of non-violent
17  offenses," but that there may be "unusual circumstances in which substantial victim
18  misconduct would warrant a reduced penalty in the case of a non-violent offense."

19      Here the conduct of Washington Mutual and Bank of America in marketing
20  high risk Option ARM and home equity loans under "stated income" conditions,
21  while turning a profit-driven blind eye to the inevitable consequences, constitutes
22  "unusual circumstances" for purposes of USSG § 5K2.10. Moreover, it is now well
23  established that district courts, as part of their post-*Booker* sentencing discretion, are
24  free to disagree with the Sentencing Commission on policy grounds.[49] Accordingly,
25  USSG § 5K2.10 does not preclude careful scrutiny of the conduct of Washington

26

27  [48]  *See* Defense Response to Presentence Investigative Report.

28  [49]  *Kimbrough v. United States* , 522 U.S. 85, 128 S. Ct. 558 (2007); *Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840 (2009); *United States v. Henderson*, 649 F.3d 955, 958-64 (9th Cir. 2011).

1    Mutual and Bank of America in determining the appropriate sentence in this case.

2    **G.    Avoiding Sentencing Disparities**

3         As provided in 18 U.S.C. § 3553(a)(6), the court, in determining the sentence

4    to be imposed, must consider "the need to avoid unwarranted sentence disparities

5    among defendants with similar records who have been found guilty of similar

6    conduct."

7         Courts have recognized that § 3553(a)(6) is primarily focused on mitigation of

8    national disparities between similarly situated defendants. *See, e.g., United States v.*

9    *Frias*, 521 F.3d 229, 236 (2nd Cir. 2008); *United States v. Smith*, 510 F.3d 603, 610

10   (6th Cir. 2007). This is a daunting, if not impossible, task. *See, United States v.*

11   *Parris*, 573 F. Supp. 2d 744, 752 (E.D.N.Y. 2008) (recognizing that "marked

12   dissimilarities from case to case" make it "realistically impossible to line up similarly

13   situated defendants on a national scale").

14        Since the Guidelines were envisioned as a mechanism for reducing sentencing

15   disparities, it is not clear what § 3553(a)(6) requires over and above § 3553(a)(4)'s

16   direction to consider the Guideline sentence. It is also unclear whether the goal of

17   national uniformity in sentencing has been achieved under the Guidelines, since

18   charging decisions and departures based on substantial assistance and other factors

19   can contribute significantly to a lack of national uniformity in sentencing.[50]

20

21   ────────────

        [50]    Sentencing Commission data for fiscal year 2010 [Exh. VV] reflect the
22   following:

23        1. Nationally 55% of all cases were sentenced within the guidelines, 1.8%
     were sentenced above the guidelines, and 43.2% were sentenced below the
24   guidelines.    25.4% of cases received government sponsored below-guidelines
     sentences and 17.8% received non-government sponsored below-guidelines
25   sentences. *Id.*, p. 283.

26        2. In the Central District of California, 34.2% of all cases were sentenced
     within the guidelines, 1.6% were sentenced above the guidelines, and 64.3% were
27   sentenced below the guidelines. 39.9% of cases received government sponsored
     below guidelines sentences and 24.4% received non-government sponsored below
28   guidelines sentences. *Id.*

                                                              (continued...)

**H.    Restitution**

Finally, the court must consider "the need to provide restitution to any victims of the offense."   18 U.S.C. § 3553(a)(7).   In this case, an order of restitution is mandatory pursuant to 18 U.S.C. § 3663A.   Mr. Ayvazyan is now employed and will be able to make some contribution toward court ordered restitution.   The 30 month prison term recommended by the Probation Office will delay, if not destroy, his ability to do so.

### III.
### CONCLUSION

For the reasons set forth above, the defense submits that the goals and purposes of sentencing defined in 18 U.S.C. § 3553(a) can be accomplished by a sentence of probation with a period of community and/or home confinement, restitution, and community service.   Based upon his incident-free conduct while on bond in this case during the past year, it is clear that Mr. Ayvazyan can and will comply with any conditions of probation the court may impose.   Accordingly, the court is respectfully requested to grant a variance from the Guideline sentencing range.

Dated: June 22, 2012

Respectfully submitted,

TARLOW & BERK PC

_____/s/_____
Barry Tarlow
_____/s/_____
Mark O. Heaney
Attorneys for Defendant
Richard Ayvazyan

---

[50.] (...continued)
3.  On a national basis, 55.5% of fraud cases were sentenced within the guidelines, 2.3% were sentenced above the guidelines, and 42.2% were sentenced below the guidelines.  19.9% of the cases received government-sponsored below guidelines sentences and 22.3% received non-government sponsored below guideline sentences. *Id.*, p. 286-87.

4.  In the Central District of California, 47.0% of fraud cases were sentenced within the guidelines, 2.4% were sentenced above the guidelines, and 51% were sentenced below the guidelines.  27.3% of the fraud cases received government sponsored below guidelines sentences and 23.7% received non-government-sponsored below guidelines sentences. *Id.*